JUSTICE NELSON
dissenting.
I dissent. In summary, Sharps’ lottery payments are income from an annuity and from intangible personal property. When Sharps became Washington residents in August 1992, Montana law provided that income received by a nonresident from intangible personal property or from annuities was not subject to Montana state income tax unless earned in connection with a business, trade, profession, or occupation carried on in Montana. Since their lottery payments were not so earned, the Department of Revenue (DOR) was and is without authority to subject Sharps’ lottery payments to Montana state income tax. The 1992 amendments to the tax code did not change Montana’s historic income-sourcing rules. Finally, under the majority’s rationale, the State taxed and is taxing Sharps’ property and income by an unconstitutional and unlawful retrospective application of statutes enacted in 1992.
As the majority points out, no Montana statute or administrative rule specifically defines lottery proceeds as income from intangible personal property. Nevertheless, that is precisely the nature of the *433 property that produces Sharps’ income. Intangible property “has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises.” Black’s Law Dictionary 809 (6th ed. 1990). Rather, an intangible is “a ‘right’ such as a patent, copyright, trademark, etc., or one which is lacking physical existence; such as goodwill.” Black’s Law Dictionary 809 (6th ed. 1990). These definitions are consistent with the notion of intangible property as used in the Montana Code. For example, § 30-9-106, MCA, defines “general intangibles” as including “things in action”; and § 70-2-101, MCA, defines “a thing in action” as “a right to recover money”.
Sharps’ lottery income derives not from any real property or tangible personal property interest, but, rather, from their intangible right under the Montana State Lottery Act of 1985 (Title 23, Chapter 7, Montana Codes Annotated) to receive annual payments for purchasing a winning lottery ticket. Sharps maintain that this statutory right is actually a form of contract right since § 23-7-311(5), MCA (right to prize not assignable but payable to estate or per judicial order) and § 23-7-312, MCA (lottery winnings subject to Title IV-D child support lien) speak in typically contract terminology.
They also argue, persuasively in my view, that their right to receive lottery proceeds is in the nature of another form of intangible property right, an annuity. An annuity is:
A right to receive fixed, periodic payment, either for life or for a term of years. [Citation omitted.] A fixed sum payable to a person at specified intervals for a specific period of time or for life.
The payment or receipt of a series of equal amounts of money per period for a specified amount of time.
Black’s Law Dictionary 90 (6th ed.1990). Indeed, Multi-State Lottery Association Rule 30.1, effective in Montana under § 23-7-202(8), MCA, specifically characterizes lottery payments as annuities payable in twenty equal installments. Moreover, the Internal Revenue Service treats lottery winnings as annuities for purposes of valuing a decedent’s estate under I.R.C. § 7520. See Tech. Adv. Mem. 96-37-006 (May 10, 1996), 1996 WL 518910.
Accordingly, whether viewed in terms of a contractual or statutory right or as the right to receive annuity payments, income from winning a lottery prize clearly derives, not from any real property or *434 tangible personal property interest, but from a thing in action or from intangible personal property.
Recognition of this legal principle is fundamental to a correct analysis of the issue presented in this case because since 1933 Montana has taxed nonresidents only on that portion of their income from annuities and from intangible personal property that is derived from sources within Montana. Under § 15-30-131(1), MCA (1991), a nonresident’s income from intangible personal property is derived from or attributable to sources within Montana only to the extent the intangible property was employed in a business, trade, profession, or occupation carried on in this State. Specifically, this section of the tax code provides:
In the case of a taxpayer other than a resident of this state, adjusted gross income includes the entire amount of adjusted gross income from sources within this state but shall not include income from annuities, interest on bank deposits, interest on bonds, notes, or other interest-bearing obligations, or dividends on stock of corporations except to the extent to which the same shall be a part of income from any business, trade, profession, or occupation carried on in this state. Interest income from installment sales of real or tangible commercial or business property located in Montana must be included in adjusted gross income. Adjusted gross income from sources within and without this state shall be allocated and apportioned under rules prescribed by the department.
Section 15-30-131(1), MCA (1991) (emphasis added).
Similarly, DOR’s administrative rule, § 42.16.1113, ARM, provides that a nonresident’s income from intangible personal property is not “sourced” within this state unless earned in connection with a business, trade, profession or occupation carried on in Montana. Specifically,
(1) A nonresident’s income from annuities', interest on bank deposits, notes, and other interest bearing obligations; dividends on capital stock of corporations, royalties from patents and copyrights; and all other income from intangible personal property is derived from or attributable to Montana sources only to the extent earned in connection with a business, trade, profession, or occupation carried on in Montana.
(2) Income from intangible personal property is earned in connection with a business, trade, profession, or occupation carried on in this state if the intangible personal property is employed as capital in this state or if the possession and control of the property *435 has been localized in connection with the business, trade, or occupation carried on in this state so as to become an asset thereof.
(3) Interest income received by a nonresident on an installment transaction arising from the sale of real or tangible business property located in Montana shall be deemed to be income from sources within Montana, unless the item is properly excludable from federal gross income.
Section 42.16.1113, ARM (emphasis added).
In 1992 a special legislative session adopted certain amendments to Title 15, Chapter 30, Montana Code Annotated. These amendments became effective August 6, 1992. Section 9, Ch. 14, L., 1992. Section 15-30-131, MCA, was amended to read: “In the case of a taxpayer other than a resident of this state, adjusted gross income includes the entire amount of adjusted gross income as provided for in 15-30-111.” Section 15-30-111, MCA, was not amended. It provides that adjusted gross income is an individual’s federal adjusted gross income. Under § 15-30-105, MCA (1992), a tax is imposed on the entire net income of nonresidents. However, after calculating the tax imposed, the tax due and payable is determined based upon the ratio of “income earned in Montana” to total income. Section 15-30-105(1), MCA (1992).
While the phrase “income earned in Montana” is not defined, there is, nevertheless, nothing about these 1992 amendments to indicate that “income earned in Montana” was intended to have any different meaning than “income from sources within Montana” as used in the pre-1992 statutes. Adose examination of these amendments leads to this conclusion.
First, the title of Chapter 14 of the 1992 Laws of Montana, “An Act Revising the Method of Calculating the Individual Income Taxes Due From Nonresident and Temporary Resident Taxpayers ...”, supports the conclusion that the amendments were enacted to change the method of income tax calculation or income tax rate, as opposed to effecting a change in the decades-old source of income rules.
Second, harmonizing the phrase “income earned in Montana” in § 15-30-105, MCA (1992), with another section of the tax code pertaining to nonresident taxation, § 15-30-142(1), MCA, reveals that this phrase has the same meaning as “income from sources within Montana.” Section 15-30-142(1), MCA, sets out the amount of income a nonresident must have before being required to file a tax return. This section was also amended by Chapter 14, but, here, the legisla *436 ture retained the reference to income sources within Montana. Specifically, the nonresident must file a return if his gross income for the tax year derived from “sources within Montana” exceeds the amount of personal exemptions. Section 15-30-142(1), MCA (1992). Only if a nonresident has a certain threshold income from “sources within Montana” must he file a return under § 15-30-142(1), MCA, and proceed to calculate the amount of tax due and payable based upon the ratio of “income earned in Montana” to total income under § 15-30-105, MCA. Thus, its use of similar language in §§ 15-30-105 and 142(1), to describe the same thing — income earned in or from sources within Montana — is clear evidence of the legislature’s intention to retain the traditional source of income rules which had been in effect for nearly 60 years prior to the 1992 amendments. In fact, as Sharps point out, a different construction leads to the absurd result that a person without a filing obligation under § 15-30-142 could nonetheless have a tax liability under § 15-30-105.
Third, the history of the 1992 amendments to Title 15, Chapter 30 of the Montana Code Annotated, is devoid of any evidence that the legislature intended to change the historic source of income rules. Rather, the proceedings behind the adoption of Chapter 14, clearly indicate that even DOR understood that the amendments were passed to correct a tax calculation problem in the pre-1992 statutes that caused residents and nonresidents to fall under disparate and divergent tax brackets. See Bostick v. Department of Revenue (Mont. Tax App. Bd. March 17, 1995), 1995 WL 147895 (summarizing the legislative history of the 1992 amendments).
Finally, DOR’s administrative rule, § 42.16.1113, ARM, cited above, remains in effect even today. As the majority acknowledges, this rule has not been amended since 1983. Obviously, had the legislature actually changed the source of income rules in the 1992 amendments, DOR, being no doubt mindful of Bick v. State, Dept, of Justice (1986), 224 Mont. 455, 730 P.2d 418, would have, likewise, amended this rule years ago and the agency would have adopted some test other than traditional income sourcing. Not only has it not done so, but DOR’s instructions to taxpayers on the 1992 Montana Income Tax Return booklet — the very year that the source of income rules apparently were done away with — and such instructions in each year since, have advised taxpayers that “[i]ntangible income, not related to a Montana business, is nontaxable.” Clearly, the nonresident income-sourcing rules of the pre-1992 tax code were not changed by *437 the 1992 legislative amendments. Importantly, even DOR believed that to be the case and apparently still does.
Sharps are absolutely correct in their assertion that where their lottery ticket was purchased and redeemed; where their first payment was received; and the location from which subsequent payments were mailed, are wholly irrelevant to the statutory interpretation issue which is at the heart of the matter before this Court. Neither the pre-1992 nor the 1992 statutory scheme had anything whatsoever to do with “contact” counting, as the majority puts it. The legislature had for decades opted to tax nonresidents on income from intangible property and annuities under a carefully crafted and very specific sourcing test; the 1992 amendments did not change that. To now interpret these clear and unambiguous statutory criteria by counting “contacts” which are not part of the statute, makes about as much sense as the blind man trying to describe the elephant’s trunk by reference to a tree.
There is no legal justification or basis in Montana law for the majority’s contact- counting approach adopted in this case. Montana’s statutes provide the appropriate basis for analysis and that basis involves application of well-established income-sourcing rules. The obvious error of our disregarding these well-established rules and in adopting contact counting is demonstrated by a simple example. If I, as a Montana resident, pm-chased General Motors stock in 1991 at a brokerage house in Billings and received the first dividend payment while residing in that city, future dividends will now be subject to Montana income tax notwithstanding that I became a Washington resident in 1992. I cannot believe that the 1992 Legislature envisioned such an absurd result or that DOR ever anticipated such a financial windfall when the 1992 amendments were enacted.
Fmthermore, I do not agree with the majority that the reasoning of Couchot v. State Lottery Comm. (Ohio 1996), 659 N.E.2d 1225, International Harvester Co. v. Wisconsin Dept. of Taxation (1944), 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373, or Stark v. Comptroller (Md.Ct.Spec.App. 1989), 554A.2d458 support its decision. In the first place, these cases did not address the sort of statutory scheme that was in effect in Montana during 1991 and 1992 — a statutory scheme which did not allow for the taxation of income from annuities and from intangible personal property of nonresidents unless that income was derived from somces within Montana. The 1992 amendments did not change that scheme. Since the court in Couchot addressed only the effect of statutes that were subsequently amended to specifi *438 cally provide for taxation of nonresident lottery winnings, the case is not on point.
As to International Harvester, the property of Sharps being taxed — i.e., their annuity income and their income from intangible personal property — was not located in and was not sourced within Montana after 1991 under this State’s statutory scheme. Accordingly, the rule cited with approval by the majority is inapplicable.
Finally, as to Stark, the opinion addresses only those payments which the taxpayer received after the adoption of statutory amendments expressly imposing a tax on the nonresident winners of the state lottery. Again, as with Couchot and International Harvester, the case is inapplicable. The 1992 amendments to Montana’s law did not effect any change from the 1991 law which, clearly, did not tax nonresident annuity and intangible property income except to the extent such income was sourced in this State under the business, trade, occupation or profession test.
To summarize then, after Sharps became residents of Washington in August 1992, under Montana law then in effect, the income from their lottery payments, being income from an annuity and from intangible personal property, was subject to Montana income tax only to the extent such payments were earned in connection with a business, trade, profession or occupation carried on in Montana. Since their lottery payments received after August 1992 — i.e., the December 1992 and subsequent payments — were undisputedly not so earned and were, thus, not sourced within this State, Montana was and is without authority to tax such payments. The 1992 amendments to the tax code did not change these historic income- sourcing rules.
This brings us to the second error of the majority’s decision in the case at bar. Assume, for purposes of this discussion only, that the 1992 special session did intend and did effect the fundamental change in the nonresident income-sourcing rules that the majority seems to believe resulted from the 1992 amendments. Because such amendments were not effective until August 6, 1992, and expressly apply only to tax years after December 1991 (§§ 9 & 10, Ch.14, L. 1992), Sharps’ December 1992 and subsequent years’ lottery payments were not, using the majority’s contact-counting approach, “earned in Montana” under § 15-30-105, MCA (1992). Furthermore, any attempt to apply such amendments to the 1991 contact events on which the majority relies as constituting Sharps’ “earning” of their lottery income violates Montana’s constitutional prohibition against retro *439 spective legislation found at Article XIII, Section 1(3), which provides: “The legislature shall pass no law retrospective in its operations which imposes on the people a new liability in respect to transactions or considerations already passed.”
Finally, while the majority judiciously chooses to avoid addressing the host of legal and federal and state constitutional infirmities inherent in § 15-30-246, MCA (1993), the passage of this legislation begs an obvious question, the equally obvious answer to which further highlights the underlying error of the majority’s opinion. If the intent of the 1992 special session and the effect of the 1992 amendments were in truth as clear as DOR and the majority now proclaim them to be — i.e., if the source-of-income rules were, in fact, done away with by the 1992 amendments — why, then, would the legislature, less than a year later, find it necessary to affirm that it had “always considered lottery proceeds to be Montana source income”? Section 15-30-246, MCA (1993). The answer, of course, is that the legislature had not always considered lottery payments to be Montana source income and that this gaping hole in the tax code was discovered only after the 1992 amendments went into effect — most likely by DOR when Sharps filed their 1992 income tax return. To paraphrase the quote from Stark cited by the majority, DOR was not complaining that Sharps won the lottery; what irked the agency was that Montana law didn’t allow the State to tax Sharps’ good fortune.
On the undisputed facts here and on what I believe is the correct interpretation of the applicable law, I would hold that Sharps’ lottery payments were not and are not subject to Montana state income tax subsequent to their change of residence to Washington in August 1992. Moreover, I conclude that under the contact-counting approach adopted by the majority here, the 1992 amendments to the tax code are being unlawfully and unconstitutionally applied retrospectively to the Sharps. I would reverse, and I dissent from our failure to do so.
JUSTICES GRAY and TRIEWEILER concur in the foregoing dissent.